### STOKES v. MACKAY et al.

(Supreme Court, General Term, First Department. June 3, 1892.)

PRINCIPAL AND AGENT—RATIFICATION—FRAUD OF AGENT.

　Where defendant states that a settlement made by his agent with plaintiff is "all right and satisfactory," and plaintiff thereupon parts with something of value pursuant to the terms of such settlement, defendant is bound by it, though the agent procured defendant's approval by concealing an important fact.

Appeal from circuit court, New York county.

Action by Edward S. Stokes against John W. Mackay and another. From a judgment for plaintiff, directed by the court, and from an order denying defendants' motion for a new trial, they appeal. Affirmed.

Argued before VAN BRUNT, P. J., and O'BRIEN and BARRETT, JJ.

*Shipman, Larocque & Choate, (Joseph Larocque,* of counsel,) for appellant John W. Mackay.   *Chas. E. Lydecker,* for appellant Hector De Castro. *Cowen, Dickerson, Nicoll & Brown, (Esek Cowen,* of counsel,) for respondent.

BARRETT, J.   This action was brought to recover a sum of money which the plaintiff alleges that the defendants agreed to pay him upon the transfer of certain property specified in the complaint.   This property, as the plaintiff avers, has with a single exception been turned over to the defendants in execution of the contract of transfer, and the excepted property was duly tendered before the commencement of the action.   The answer is, in substance, a general denial.   The defendant Mackay claims that he never made the contract set forth in the complaint.   He also claims that he was the exclusive owner of the property embraced within the contract, and consequently that there was no consideration for any agreement on his part to pay for such property.   At the close of the trial the defendant De Castro moved the court to direct a verdict in his favor.   The plaintiff then moved for a similar direction in his favor.   The defendant Mackay followed by a renewal of his motion to dismiss the complaint as against him "on the ground that the whole evidence in the cause was insufficient to establish the plaintiff's pretended cause of action," and he requested, in the event of a denial of such motion, to go to the jury on certain specific questions of fact.   The court denied all the motions made by the defendants, and granted the plaintiff's motion.   A verdict was accordingly directed in favor of the plaintiff for the $100,000, which, under this ruling, the defendants agreed to pay upon the transfer of the property, less a credit of $25,000, acknowledged by the plaintiff to have been paid on account of the sum in question, with interest.

The consideration of the question thus presented has necessitated the perusal of the entire record, it being our duty to determine not only whether the defendants' motions for a direction or dismissal upon the whole case were correctly denied, but whether there was any evidence, material to the specific questions as to which they requested to go to the jury, which should have been submitted to that body.   It will be necessary, therefore, to consider the rulings of the learned judge at circuit from the standpoint of the testimony adduced by the defendants, and by such part only of the plaintiff's testimony as is not substantially denied, and which is supplemented by the documents. We find in this voluminous record an immense mass of contradictory testimony, conflicts between the witnesses themselves and between the witnesses and the documents.   But these conflicts are all upon matters which neither affect nor vary the conclusions properly deducible from undisputed facts, or from facts as to which the dispute is so trivial or unsubstantial that a verdict contrary to the direction would necessarily be set aside.   The facts which are undisputed are these:   In the year 1884 Mackay was the principal proprietor of what was known as the "Postal Telegraph Line."   He had invested a large amount of money in this property, and the adventure had proved unsuccessful.   There was at the same time another telegraph line called the "Bankers' & Merchants' Telegraph Company."   The latter was in the hands of receivers, and Stokes suggested that Mackay should advance him money wherewith to purchase the receivers' certificates, with a view to acquiring the property, and consolidating it with the Postal Telegraph Line. After some discussion, and "looking over the different lines," Mackay agreed to this.   He was to furnish the money and "see how Stokes got along."   He did advance large sums of money, from time to time, and Stokes purchased the receivers' certificates and other property therewith.   All these purchases were in Stokes' own name.   Mackay's name was kept out of the transactions for the reason that, if his connection therewith became publicly known, it would be difficult to purchase the contemplated property "for anything like what it was worth."   It was agreed that the advances should be made to

Stokes through De Castro, and that De Castro should procure the money from Mackay through one Platt, who was the agent here of the Nevada bank in which Mackay was interested. In 1885, Stokes purchased the Bankers' & Merchants' Telegraph Company at a judicial sale, paying for it in part with the receivers' certificates which he had previously acquired. Stokes bid the property in in his own name, but he directed the deed to be given to a new corporation, which he organized, called the "United Lines Telegraph Company." There were additional telegraph lines connected with the Bankers' & Merchants' Company, or with the United Lines Telegraph Company, which were built under Stokes' supervision. Stokes was president of the new company, and received a majority of its common stock, amounting to upwards of $2,000,000, and some $900,000 of its bonds. He continued operating the new line, and building other lines to be operated in its interest, while Mackay continued to make advances to him for the acquisition of additional telegraph interests. Thus the business, and the relations between Stokes and Mackay, continued without change from the summer of 1885 down to 1888. In December, 1888, Mackay received information that Stokes was using some of the United Lines securities for his own purposes, and he determined to take all such securities out of Stokes' hands, and to keep them himself. Mackay was at this time in San Francisco, De Castro and Platt in New York. De Castro, who had acted as an intermediary for Mackay throughout, (in the manner already indicated,) was instructed by Mackay to have all the securities in Stokes' hands turned over to Platt. De Castro testified that he received a telegram from Mackay about the 20th of December,—from San Francisco,—asking for the delivery of the bonds and securities to Platt. Mackay testified that the turning over of the securities was the result of considerable correspondence and negotiation between himself and De Castro; that the negotiation with Stokes with regard thereto was conducted principally by De Castro, though he also told Platt, once or twice, to assist in securing the property. Platt testified that De Castro told him, either in the latter part of November or early in December, that he had received a communication from Mackay, demanding that he, De Castro, should get back the securities. Thus, upon the testimony of all the principal witnesses for the defendant, De Castro was clearly Mackay's agent to negotiate with Stokes for the property, and to secure its being turned over to Mackay; that is, to Mackay's representative, Platt, for him, Mackay. At this point the parties diverge. Mackay contends that the bonds and stock of the United Lines Telegraph Company were exclusively his property; that they were purchased by Stokes with his, Mackay's, money, and were held by Stokes simply as his agent. He further contends that Stokes had no interest, legal or equitable, in these bonds and stocks, and that he had in fact acted throughout gratuitously; that is, without any contract for compensation. Stokes contends, upon the other hand, that he was a joint adventurer with Mackay in all the transactions in which they were engaged; that he was to do the work, and Mackay was to furnish the money; that the telegraph systems in question were to be consolidated; that Mackay was to be repaid all of his outlay in the Postal system, and all of his advances to Stokes in connection with the other systems and companies, and that the surplus was to be divided between them.

After a thorough review of the entire record, we feel bound to say that the appellants' present contention is refuted; refuted, not by testimony as to which there is a conflict, but by Mr. Mackay's own testimony, by his own letters, and also by the testimony of his own witnesses; in fact, by all the testimony in the case. In his direct examination, Mackay denied that anything was ever said at any time between Stokes and himself about a division of the property. He seems, however, to have had in his mind throughout a distinction between a division of the property itself, and a division of the surplus resulting from the consolidation of the properties; for, although

in his direct examination he denied that anything was said between them in the year 1884 about a division of such surplus, yet upon his cross-examination he conceded that he promised Stokes a share of such surplus stock in or about the year 1886. A brief quotation from Mackay's cross-examination will suffice to make this clear: "I told Mr. Stokes that after this property had got out of litigation, and when we had an opportunity to consolidate it with the Postal and United Lines, that I would reserve some stock for him. *Question.* Then it was upon the understanding upon your part that out of the profits he was to have some of the balance of stock that constituted the profits, was it not? *Answer.* If there was any profit. *Q.* And how does that differ from Mr. Stokes' statement of it, as you have heard it upon the stand? *A.* I don't recollect hardly his statement of it. If I took and read it, I would know more about it." De Castro, too, fully confirmed this, as the following extracts from his testimony disclose: "*Q.* You understood he (Stokes) would share in the amount of the profits if there were any? *A.* Yes, sir. Mr. Mackay had promised, when all things were cleaned up, Mr. Stokes would receive a certain amount of the profits. Mr. Mackay never denied that. I understood that. *Q.* That when the matter was all cleaned up— *A.* All cleaned up and settled. *Q.* That Mr. Stokes would be entitled to a certain share of the profits? *A.* Yes. *By the Court:* *Q.* Did Mr. Mackay say that to you? *A.* Yes; he did several times. He didn't deny that. He did not state any amount. * * * *Q.* Do you take back what you said you understood from Mr. Mackay that when the matter was finished and closed up Mr. Stokes would be entitled to a share of the profits of this enterprise, —do you take that back? *A.* I take back nothing of that." Ingersoll went further than this, for in his letter to Mackay of December 26, 1888, he said that Stokes had sworn again and again that the bonds belonged to him, (Stokes;) and that he, (Ingersoll) "understood and understands the fact so to be,"—a statement which Mackay, in his letter of reply, did not question. Mackay's letters, too, point repeatedly to Stokes' interest. On the 6th of February, 1885, he wrote to Stokes a letter in which the following language is used: "However, if you can get in the B. and M., with the other securities you mention, at $500,000, you must make a good profit on it, or there is something rotten in the business." Again, on the 30th of April, 1885, he says: "You say $100,000 will finish you till sale day. All right. I will advance this amount; but not another dollar. This is the finish. Now, you can do as you please,—sell it out or give it away, just as you please,—but don't depend on me for another dollar. * * * Now, I have explained very fully my ideas on this telegraph business. I don't want either to buy in the B. and M.'s or Postal at any price. So you are now at perfect liberty to do as you please. I only hope you will make something for yourself to pay you for your trouble. I am satisfied." Mackay explained this letter in his testimony as follows: "*Question.* You meant to authorize him by that letter, did you, to sell the property if he pleased, and repay your advances and keep all the profits to pay for his trouble? Did you mean that or not? *Answer.* Yes, sir; I did at the time; and I wished they had burned up twenty times afterwards, for they always got me into trouble." On the 2d of May, 1885, he writes: "When the time arrives, and you have everything in shape, you can dispose of the whole thing, and close it out to the best advantage. The plant is valuable to those other companies, and with it their stock would go to par. With no more opposition, you would have no more telegraph companies. The business is finished, at least for many years to come. I would sooner lose $100,000 or $200,-000 than to see you stuck at the end of the game. But, as I wrote you and explained many times, I want to get out of the business. As it is now, I have to pack everything alone, or, if you can make a good combination with new men of capital, it might be worth considering. But for my part

I can't attend to it." On the 5th of the same month he writes: "Nothing would suit me better than to see you wind up the whole affair. It will be much better for you in the end, less care and bother. I hope you will not be led away into rosy-colored anticipations on the result of this matter." On June 4th, 1885, he writes: "You have managed your part very well. If you can manage to take in a partner who can furnish $500,000, I will think you are a good financial man." A couple of years later he writes even more emphatically regarding Stokes' interest, for in his letter of February 9, 1887, we find the following expression: "Mr. Platt telegraphed me to-day that Mr. Chandler and he forwarded me at your and Mr. Garrett's request a copy of an agreement relative to making a combination with all our joint telegraph lines with Mr. Garrett. Now, I will say, in advance of knowing what this agreement is, I am willing to do anything that is fair in the matter, and, as I wrote Mr. Chandler to-day, that whatever he and Col. Ingersoll agreed upon I will accept, as I wish nothing but what is fair and right. There is no use in making any combination if it is not done right. As you are one of the principal parties interested in the United Lines, I presume you are of the same opinion. I am willing for you, Mr. Garrett, Mr. Bates, Mr. Chandler, and Col. Ingersoll to sit down and agree on a fair proposition, and I will agree to it."

It is impossible to read all this correspondence and evidence—to say nothing whatever of the plaintiff's own testimony—without rejecting the appeal to our credulity made by the appellants' present contention that Stokes was for years engaged in all these complex, harassing, and responsible duties as the mere servant of the defendant, without a shadow of interest, or even compensatory right; that Mackay was therefore unconditionally entitled to the possession of the property in question at the time it was demanded, and that upon its receipt he would have satisfied even his moral obligation to Stokes had he thrown him a coin of a size corresponding with his generosity. It is easy to understand why no request was made to go to the jury upon this specific question; and the rule which governs when both parties ask to dispose of a case by direction or dismissal, and subsequently one party requests to go to the jury upon specific questions, namely, that the right is waived as to all questions not specified, (*Muller* v. *McKesson*, 73 N. Y. 195; *O'Neill* v. *James*, 43 N. Y. 93; and see *Koehler* v. *Adler*, 78 N. Y. 287; *Mayer* v. *Dean*, 115 N. Y. 556, 22 N. E. Rep. 261,) may here be applied without fear that the waiver was the result of oversight.

We have dwelt upon this preliminary branch of the case thus fully, because of the emphasis with which the learned counsel for the defendants now insist upon Mackay's unqualified right to the possession of the securities, and because of their earnest assertion that there was no understanding or agreement at any time that Stokes was to have the least interest in the property purchased. We fully appreciate the necessity for upholding these positions, as they seem to us to be crucial. If, for instance, Stokes held these securities as it is thus insisted he did, and took advantage of his mere possession to oppress Mackay, and to compel compensation to which he had not a shadow of legal right, the whole fabric of the alleged agreement and of its approval by Mackay becomes interwoven with elements plainly hostile to the construction claimed by the respondent. If, however, Mackay and he were joint adventurers, and his possession of the securities was the possession of one joint adventurer of property in which he had an interest, there was nothing oppressive or unjust in retaining it until reasonable terms and conditions with regard to its abandonment had been acceded to. Even if Stokes' possession was but that of one who had an interest in the surplus profits derivable from the use of the property in the enterprise, still a waiver of his rights with regard to such surplus profits would have been a sufficient consideration for Mackay's promise to pay the amount specified in the agreement, and to re-

lease the claim against Reed & Co. *Hamer* v. *Sidway*, 124 N. Y. 545, 27 N. E. Rep. 256. It is clear that not a dollar of Mackay's money went directly to purchase these United Lines bonds and stock. These securities were the product of Stokes' purchase of the Bankers' & Merchants' Company, and of its practical merger in the United Lines Company. It is true that the money which Mackay advanced to Stokes gave the latter the means of purchasing the Bankers' & Merchants' Company, and that in equity Mackay's rights attached to the product of the new company. Stokes, however, had the legal title to all this property, and this legal title had imposed upon him all the personal responsibility which was attached to the enterprises. He could not have been deprived of that title by any action at law which Mackay could have brought against him in December, 1888. If Stokes were misapplying the property, Mackay could undoubtedly have terminated the adventure by a bill in equity; and the securities, pending an accounting and settlement, could have been placed in the hands of a receiver. It is clear, upon Mackay's own showing, and upon the undisputed facts, that he had no right to the exclusive possession of the property in question when he directed De Castro and Platt to negotiate for it. At all events, he knew perfectly well that Stokes then had the right either to impose such conditions as would secure his interests if he remained in the adventure, or to demand reasonable terms if he went out of it, and, in going out of it, gave up the property and all his interest therein, or even if he gave up his prospect of surplus profits. This was the true and precise situation of affairs when De Castro and Platt commenced to negotiate for the possession of these securities.

It seems, however, that Stokes had no desire to retain the securities, or to exercise his strict legal right in that regard. He testified that he felt, during these negotiations, that Mackay had a right to the securities as collateral for the money he had advanced for the telegraph property; and it was then his understanding that, upon giving him a written agreement, setting forth his interest in the property, Mackay would be entitled to their possession. He even wrote a letter to De Castro, as far back as the year 1885, providing for the contingency of death, and acknowledging that the money which Mackay advanced had been used in buying the assets of the old Bankers' & Merchants' Telegraph Company, and that upon his death Mackay was to have absolute control of them. It is not a correct view of Stokes' attitude that he thus admitted Mackay's right to the exclusive and unconditional possession of the securities. This testimony and letter indicate nothing of the kind. They simply show that he had no selfish, much less extortionate, spirit in the transaction; and that it was not unreasonable, after all he had done, and all he had gone through, in the four years of ceaseless activity, strife, anxiety, and personal responsibility which the record discloses, to require a written agreement embodying his rights before parting, in his lifetime at least, with the property in which his labor and thought were invested quite as much as was Mackay's money. Finding that such an agreement was not obtainable, he was willing to sell out his entire interest in the property, and to leave the future, with its probable or possible gains, entirely to Mackay. Accordingly a contract was prepared by Col. Ingersoll, who had acted as counsel in the legal difficulties attending the adventure, and who was therefore in effect counsel for both parties, though nominally counsel for the various companies that figured in the enterprises in question, and also for Stokes as the person in whose name the business was done. Col. Ingersoll always had the confidence of Mackay. Mackay knew that Stokes had employed him in their telegraph affairs, and he testified that Ingersoll ought to have known all about his transactions with Stokes. Ingersoll also testified that he acted in cases "in which Mr. Stokes appeared to be the party in interest, knowing at the time that Mr. Mackay was also interested, and that Mr. Mackay was furnishing money." This contract, as prepared by Col. Ingersoll, provided for a sale of

Stokes' interests, and the turning over of the property by him to Mackay and De Castro, in consideration of $100,000 in cash and the cancellation of all claims against Stokes and against the firm of C. H. Reed & Co., (of which Stokes was a member.) The latter claim amounted to upwards of $370,000, and was in the form of a note given by Reed & Co. for advances to them by Mackay. This note was made payable to the order of De Castro. The parties— De Castro, Platt, Ingersoll, and Stokes—met at the Hoffman House on the afternoon or evening of the 24th of December, 1888, and the contract under consideration was presented. De Castro objected to it, but said that if Stokes would turn over the securities, he would sign it, subject to Mackay's approval. "Stokes then said" (we quote from De Castro's testimony) "that he wouldn't surrender the securities to me, but if I did sign the contract he would surrender them to Mr. Ingersoll, and Mr. Ingersoll should keep the securities until Mr. Mackay should be heard from, and, should Mr. Mackay not accept the tenor of the contract, those securities were to be held subject to Mr. Stokes' orders,—express orders. I think Col. Ingersoll was there when this was going on," Ingersoll's testimony is to the same effect: "Mr. Stokes said that I was to hold the bonds; that they were to be given to me; and that, if Mr. Mackay approved the contract, I was to turn these bonds and any other securities I might have over to Mr. Mackay or his representative. If Mr. Mackay didn't approve the contract, I was to hold all these things subject to Mr. Stokes' order. I was to give them back to him." And again: "*Question.* State what Mr. Stokes said to you, if you can distinguish it from what any one else said. *Answer.* Mr. Stokes wanted me to send that agreement to Mr. Mackay, and, if Mr. Mackay approved it or signed it, I was to turn those bonds, or any other things I might receive in the mean time, over to Mr. Mackay or his representative. If he did not approve of it, I was then to hold these bonds subject to Mr. Stokes' order. That is exactly what Mr. Stokes said. De Castro was present when that statement was made." Platt corroborates this. He says that Ingersoll had a consultation with De Castro and Stokes, and then told him, in their presence, that the agreement would be sent to Mr. Mackay for his signature or approval, "pending which the bonds would be placed in his (Col. Ingersoll's) hands, to be returned to Mr. Stokes if Mr. Mackay's approval was not given." With this understanding, the contract was signed by Stokes and De Castro; and Stokes then delivered some of the bonds to Ingersoll, together with the key of the vault in a certain deposit company, where 635 other bonds were deposited. Stokes also gave Ingersoll an order on the deposit company for the delivery of these bonds, and this order was witnessed by De Castro. Ingersoll, upon the other hand, receipted for the bonds at the foot of the contract. Shortly after this, and on the same day, De Castro went to his room in the Hoffman House, and prepared a cipher message to be telegraphed to Mackay. That message, as translated, reads as follows:    "NEW YORK, Dec. 24.

"E. S. Stokes turned over to Col. R. G. Ingersoll nine hundred and thirty-five thousand of bonds and other securities. He signed also an agreement, which is forwarded to you, and which leaves him out. Col. R. G. Ingersoll will turn over to E. C. Platt these securities for custody. This is the only way it could be done, and I hope it will be satisfactory. E. S. Stokes swears that he told you about having to use some of the bonds to raise money which he needed absolutely to avoid bankruptcy. Please accept my best wishes for happy Xmas.    H. DE CASTRO."

This was sent within about an hour, and it reached Mackay the same evening. Stokes never saw the telegram, but De Castro told him that he would telegraph to Mackay that "this"—that is, what had been done—"is the very best that I can do, and that this leaves you [Stokes] out of the telegraph business entirely." De Castro does not deny that he told Stokes substantially

what he had telegraphed, as above indicated, nor does he say that he told Stokes of his omission to specify the consideration which was to be given by Mackay. Platt also sent Mackay, the same evening, a cipher dispatch, the translation of which reads as follows:

"I did not succeed in meeting Stokes until late to-day, when made demand for U. L. T. Co. Bds. Ingersoll was present, and said that, owing to legal complications, he thinks it would be better not to deliver U. L. T. Co. Bds. to me for the present, and Ingersoll requests me to telegraph you that Stokes has deposited with him to-day 900,000, 30,000, 5,000 1st Mtge. U. L. T. Co. Bds. 1,000,000, 600,000 stock will be assigned, and all judgments turned over on your order as soon as agreement forwarded to-day is signed by you. He said this course had to be pursued to avoid trouble in the courts, and he says this gives you entire control of the property.         E. C. PLATT."

This letter telegram was prepared from a paper signed by Col. Ingersoll, which embodied the substance of what Platt so sent. Ingersoll wrote this paper out, and handed it to Platt with instructions to telegraph its contents to Mackay. This was said and done while Stokes was present in the room, but Platt could not say that Stokes knew how the paper was worded. There is, in fact, no evidence that Stokes knew the precise tenor of either telegram. The next day—the 25th—was Christmas day. On the 26th Stokes went to the safe-deposit company, and assisted in the delivery to Ingersoll of the 635 bonds which were there deposited. Upon the same day Ingersoll wrote to Mackay, enclosing the contract, and requesting him, if it met his approval, to sign and return it. Shortly after this, De Castro, having received from Mackay an answer to his telegram of the 24th, furnished Stokes with a copy of such answer. The answer reads as follows:         "SAN F., Dec. 24, 1888.

"*To Hector De Castro, New York:*  All right and satisfactory. I want you to tell Col. Ingersoll to do nothing in this case except what he knows to be correct and legal, as I don't want trouble for what has been done in the past nor the future.  E. S. Stokes never mentioned anything about bonds to me, either directly or indirectly."

In the copy of this telegram, which was furnished to Stokes by De Castro, the last sentence was omitted. Upon receipt of this copy, Stokes acted upon the approval of the contract which the expression "All right and satisfactory" conveyed to him, and he at once took from De Castro a receipt for the bonds, and definitively parted with his possession in favor of Mackay. De Castro wrote this receipt himself at the foot of Ingersoll's original receipt for the bonds, and it reads as follows: "Receipt of above acknowledged. H. DE CAS-TRO." After this Stokes treated the matter as closed, and continued to deliver the securities from time to time to Ingersoll. It is contended upon this appeal that there is a conflict with regard to these latter facts, but in looking at all that De Castro said upon the subject we find no real or substantial conflict. It is true that upon his direct examination he makes the singularly absurd statement that he put the words: "Receipt of above acknowledged. H. DE CASTRO,"—where they appear on the contract, "to witness Col. Ingersoll's signature," and that he put them there at the time Ingersoll signed his receipt. This statement, however, is easily explainable without reflecting upon either De Castro's veracity or common sense. It evidently passed through his mind that he had witnessed a signature at the time the contract was signed, as, indeed, he had Stokes' signature to the order on the safe-deposit company for the delivery of the bonds to Ingersoll. This undoubtedly caused the confusion, which, however, was but momentary, as in almost the same breath he declared that he wrote this receipt after Ingersoll told him that he (Ingersoll) had received the bonds. Subsequently he made this still clearer in his answers to the learned judge. To him he said it must have been done a day or two after the transaction of the 24th of De-

cember. "*Question.* It was a day or two after the transaction? *Answer.* Yes. *Q.* And after Col. Ingersoll told you he had actually received the bonds? *A.* Yes. *Q.* And if Col. Ingersoll says he signed this on the evening of the 24th, then it was a day or two after Col. Ingersoll signed it? *A.* Exactly; yes, sir. Col. Ingersoll had not seen the bonds, your honor, on the evening of the 25th." All doubt, however, was completely dispelled by his cross-examination. He there testified that Stokes was present when he signed the receipt; and that he (Stokes) wanted him to acknowledge the receipt of the bonds; that he had no recollection of what was said, (thus leaving Stokes' recollection of what was said uncontradicted;) that he did not know "but what this receipt was signed on the 27th of December, and could not tell whether it was on the 26th or 27th." Then, too, all that transpired in connection with this receipt is in entire harmony with De Castro's testimony as to what occurred on the 24th. At that time Stokes would not, so De Castro testified, surrender the securities to him, but would surrender them to Ingersoll until Mackay was heard from. Now, on the 26th or 27th, Mackay was heard from, and then Stokes was ready to surrender the securities to De Castro, and to take his receipt therefor. The conclusion is irresistible that it was after the delivery to Stokes of Mackay's answer, "All right and satisfactory," that De Castro's receipt was given, and that it was so given because of the approval of the contract which Mackay's telegram evidenced. This was distinctly testified to by Stokes, and it is impossible to say that he is contradicted in the least by De Castro.

The same observation which we have already made with regard to the failure to ask to go to the jury upon the question of Stokes' interest in the adventure may here be repeated. No such request was made with regard to this receipt of De Castro, nor with regard to the absolute relinquishment of possession which, in connection with the testimony, it evidenced. Doubtless the reason in the one case was the same as in the other. There was nothing to go to the jury upon. The testimony on both sides was all one way. It was, in truth, either a receipt for the bonds in execution of an approved and then completed contract,—as testified to by Stokes,—or else the words: "Receipt of the above acknowledged. H. DE CASTRO,"—were written quite superfluously on the 26th or 27th to witness Ingersoll's previous signature of the 24th; that is, to express the idea that Stokes or De Castro thought it safer to make Ingersoll's original acknowledgment more binding by a supplementary acknowledgment from De Castro to the effect that he (Ingersoll) had received the bonds,—a touch of frivolous nonsense, which De Castro receded from the moment he was subjected to the learned judge's questions and to cross-examination, and, in so receding, substantially admitted the accuracy of what Stokes had said on the subject. At this point it will be perceived that the case turns largely upon the effect of Mackay's words, "All right and satisfactory." Was this an approval of the contract signed by Stokes and De Castro on the 24th, or was it merely an approval of the turning over the securities to Ingersoll until Mackay could see the contract, and decide upon it? We have pointed out, by reference solely to testimony adduced by the defendants, that the understanding of all the parties was that the turning over of the bonds by Ingersoll to Mackay's representative was not to depend upon Mackay's formal signature to the instrument. It was Mackay's approval or signature which Ingersoll was to await. If, for instance, upon the actual receipt of the instrument on the 3d of January, 1889, Mackay had telegraphed, "All right and satisfactory," no one would have doubted what was meant; nor would Ingersoll have hesitated in at once turning over the bonds, without awaiting the return of the instrument with Mackay's formal signature appended. So, too, if De Castro, in his telegram of the 24th of December, had specified the consideration which Mackay was to give,—as, for example, if he had added to the

words, "He signed also an agreement, which is forwarded to you, and which leaves him out," the words: "You to pay $100,000 in cash, and to cancel C. H. Reed & Co.'s note,—there would have been no doubt of what was meant. An answer, "All right and satisfactory," to such a telegram, would have been a clear approval, and would have given the contract the binding force of a completely executed instrument, or, to speak more precisely, of a parol contract of sale evidenced by the written instrument.

The question is, therefore, are these words, under all the surrounding circumstances, to have any less effect because Mackay's agent did not choose to inform his principal of the consideration which such principal was to give for what he got? We think not, and here we see no escape from the cogent reasoning of the learned judge at circuit, abundantly supported as it is by his citation of authority. Mackay certainly knew, when he received De Castro's telegram, that the bonds had not been turned over for nothing. He knew, too, that an agreement had been signed by Stokes, and that that agreement naturally was not unilateral. He knew it was an agreement whereby Stokes was "left out;" that is, whereby Stokes gave up the property and relinquished to Mackay all his interest therein,—in fact, went out of the entire adventure, and abandoned all hope therefrom, or of reward for his years of toil. It is idle to say that Mackay could possibly have supposed that he was not to pay for all this in some form, or that the agreement, which gave him all he asked, contained no consideration whatever moving from him. We are told that what Stokes did in giving up everything was what was "all right and satisfactory" to Mackay,—this and nothing more. To such a view we can hardly be expected to assent. It is as fallacious and almost as preposterous as Mackay's own view, given upon the witness stand, that by the word "all" in the expression "All right and satisfactory" he meant "all the property." The effort to deprive plain English of its natural import under the stress of its apparently injurious effect upon one's interests usually causes a retreat to some such position as this, and makes the common-sense view of the language employed clearer and more conspicuous. It will also be observed that there was not a word in De Castro's telegram which even suggested that the agreement was to remain subject to Mackay's approval until the instrument reached San Francisco. On the contrary, every word implies a call for Mackay's immediate approval or disapproval. He could, of course, if he doubted the wisdom or propriety of his agent's partly undisclosed bargain, have telegraphed for further particulars; but he could also say,—as in effect he did: "You have secured all I asked, and you have doubtless done so on reasonable terms. I have confidence in your fidelity, and without inquiring as to the precise terms upon which you have thus secured all I asked, I approve. All is right and satisfactory."

There can be no doubt as to the correctness of the general rule contended for by the appellants, that before a principal can by any act of his be held to have adopted or ratified the previously unauthorized act of his agent, he must be fully advised of all the material facts. It is, however, equally well settled that a principal may, if he chooses, adopt or ratify his agent's acts without such information, if his intent to do so be clearly manifest. He may say, if he chooses, that he has such confidence in his agent's judgment and fidelity that he will abide by any reasonable liability which the agent has honestly and in good faith assumed to impose upon him as a consideration for the accomplishment of the required service. In other words, the principal may, if he chooses, take the risk of his agent's act without inquiry, and adopt the whole act. *Rogers* v. *Kneeland*, 10 Wend. 249; *Condit* v. *Baldwin*, 21 N. Y. 221; *Meehan* v. *Forrester*, 52 N. Y. 277; and see *Lewis* v. *Read*, 13 Mees. & W. 834, and *Wilson* v. *Tunman*, 6 Man. & G. 238. That this case comes within the latter principle is clear, not only from the documents, but from the defendants' own testimony. Let us look at the situation

of the parties. First, the plaintiff's situation. He knew that the substance of what had transpired between himself, De Castro, Ingersoll, and Platt was to be telegraphed to Mackay. He had no reason to believe that any material fact was omitted or suppressed. The bonds and stock were to be returned to him if Mackay disapproved the agreement. They were to go to Mackay if he approved or signed it. . De Castro was to telegraph the substance of what had transpired. That involved the substance of the agreement. When, therefore, De Castro appeared with Mackay's answer, "All right and satisfactory," Stokes had a right to understand that such answer meant an approval of the contract, and there cannot be the slightest doubt that he did so understand. If it did not mean that, it was a fraud upon him. If De Castro secured from his principal an expression of approval by concealing an important fact, and then obtained a final relinquishment of the securities by the exhibition of such approval, who, it may be asked, would suffer? The third person, who innocently gave up his rights upon the agent's substantial assurance of the principal's approval with full knowledge of all the material facts, or the principal, who relied upon his own agent, and profited by the agent's acts? There can be but one answer to this question. But let us go further. If Stokes had been apprised of the precise terms of De Castro's telegram to Mackay, the case would not be altered, for then the principle upon which the learned judge at circuit directed the verdict would govern. We mean the principle already referred to, that Mackay's intent to approve of the agreement, whatever might be the consideration expressed therein, was clearly manifest. Here we must look at Mackay's situation when he received this telegram from De Castro. He knew that negotiations had been pending for some time between De Castro and Platt on the one side and Stokes on the other, and that Stokes, to use Mackay's language, "was always putting them off." He knew that Stokes was not likely to abandon all his rights gratuitously. Suddenly he receives De Castro's telegram, and almost at the same time a telegram from Platt. In the latter telegram he is distinctly told that Ingersoll thought it would be better not to deliver the securities to him (Platt) for the present. He was also told that Stokes had deposited them with Ingersoll, and that they would be turned over on Mackay's order "as soon as an agreement forwarded to-day is signed" by him. Thus he knew that the turning over of the securities to Platt on his (Mackay's) order— which it was thought best not to permit "for the present"—depended on his signing the agreement. Now, Mackay, by his answer to the telegram, makes it entirely clear that his intention was to approve the agreement at once, without waiting to see or sign it, and thus to secure the transfer of the securities to Platt forthwith. His answer to Platt reads as follows: "Telegram received all right. You take whatever securities Ingersoll gives you, as Ingersoll understands this matter fully. I do not wish him to do anything but what is legal." Here Mackay entirely ignores the time which must elapse before the contract arrives. Platt is to take the securities,—whatever Ingersoll gives him. The appellants would have us read the telegram in this wise: "You take whatever securities Ingersoll gives you when, after the contract arrives, I read and approve of it." But Mackay himself, in his own testimony, tells us not to read his words in this manner; that he meant take the securities now,—immediately,—without regard to the terms of the contract, without waiting for any further approval of it.

The testimony to which we refer reads as follows: "*Question.* And you said, ' Take whatever securities Ingersoll gives you.' Did you ever countermand that order to Mr. Platt or to Mr. De Castro? *Answer.* I don't think I did. *Q.* And you meant from the moment that telegram was sent that they should go on taking whatever securities Mr. Ingersoll should give them ? · *A.* I instructed them a year and a half before that telegram ever came. *Q.* I ask you whether, from the moment this was given, you intended that they

should go on taking whatever securities Colonel Ingersoll gave them. *A.* I did. They belonged to me." The last expression is the keynote to Mackay's position throughout the controversy. In effect he says: "Stokes had no interest in the property, nor in the adventure. He was my servant; glad to work for me for nothing, because of kindness shown him in other directions. He relied entirely upon my generosity in all these telegraph matters. I alone owned these securities. I alone had a right to their possession, and I had a right to secure such possession in any way I could. You, my agents, tell me I am to have the property only when I agree to something. Get the property any way, agreement or no agreement, consideration or no consideration. Get it now. Get it before the agreement reaches me. That is what I meant, and all I meant, by my 'All right' to Platt, 'All right and satisfactory' to De Castro." The contention, therefore, that what Mackay approved was not the contract itself, but the provisional arrangement, does not bear the test of analysis. De Castro's telegram does not say a word about any provisional arrangement. Consequently the answer to that telegram could not have referred to a provisional arrangement. That answer was necessarily an approval of what was referred to by De Castro in his telegram as having been definitely done, namely, the turning over of the securities to Ingersoll, the agreement which was forwarded and which left Stokes out, the fact that Ingersoll would turn over the securities to Platt, the statement that all this was the only way it could be done, and the hope that all this would be satisfactory. Everything was embraced in this telegram, except a clearly implied consideration, and as to that Mackay was bound to ask for particulars, if he wanted them, before saying that it was "all right and satisfactory." His answer, therefore, was an answer to an absolute, and not to a provisional, arrangement, and must be treated as such.

If, however, his answer to De Castro be read in the light of the provisional arrangement suggested by Platt's dispatch, and if it be treated as an answer not to De Castro's telegram alone, but to the two, it becomes still clearer that Mackay's approval was not of a provisional arrangement, because, as we have seen in his answer to Platt, he brushes aside everything like a provisional suggestion, and tells him to get the securities from Ingersoll now. Thus, too, any question of intention, or of two inferences from admitted facts, or of any possible doubt calling for a submission to the jury, is set at rest by Mackay's own testimony as to what his intent was. Having explicitly told the court and jury that his intent was to have Platt get the securities from Ingersoll at once, without waiting to see the contract, he settled any possible question of fact, and left nothing but the legal deduction therefrom to be drawn by the learned court. It may be added that this expression of intent on Mackay's part was entirely natural. Why, indeed, should he have inquired as to the consideration of a contract which he had good reason to believe had been prepared, or at lease supervised, by his close and honored friend, Col. Ingersoll,—a legal gentleman upon whom he relied so implicitly that he telegraphed to De Castro: "Tell Col. Ingersoll to do nothing in this case except what he knows to be correct and legal;" and to Platt: "Take whatever securities Ingersoll gives you, as Ingersoll understands the matter fully;" to whom he subsequently wrote: "You know exactly what is to be done, and I want nothing done except through your instructions;" and whose name, as his confidential friend and adviser, runs through the whole case. And why should he have doubted the care, prudence, and fidelity of Platt and De Castro? Might he not well have believed that between all three of his friends—Ingersoll, Platt, and De Castro—his interests had been scrupulously guarded? Nor was he averse to accepting blindly agreements thus made by people in whom he had confidence, as evidenced by his letter to Stokes, already quoted, of February 9, 1887, wherein he says: "I am willing for you, Mr. Garrett, Mr. Bates, Mr. Chandler, and Col. Ingersoll to sit

down, and agree on a fair proposition, and I will agree to it." And again: "I wrote Mr. Chandler to-day that whatever he and Col. Ingersoll agreed upon I will accept." What followed abundantly accentuates this view of Mackay's attitude, and confirms the correctness of the learned judge's direction. Mackay probably believed, when he received the instrument in due course of mail, that Platt and De Castro had acted on his previous telegrams, and that the s curities were in their possession,—as, indeed, in a legal sense, they were, as already pointed out. The time had now come when he could say, "Not quite right, nor quite satisfactory," with impunity. The burden of regaining possession would now be on Stokes if Platt had in the mean time taken all the securities Ingersoll would give him. And his full confidence in Ingersoll, as before observed, is manifested throughout,—a confidence which the record shows was entirely well founded. If, however, Platt had not actually taken the securities out of Ingersoll's hands,—which could have been Mackay's only possible doubt,—it was important to repeat the previous order that the securities be turned over to Platt. It was prudent, also, not to attempt to withdraw his previous approval of the contract in so decided a manner as to indicate that in the end he would not sign something substantially like it. All this is evidenced by the temporizing character of his telegram to De Castro and of his letter to Ingersoll. This is the telegram:

"SAN FRANCISCO, CAL., Jan. 4, 188 .

"*Hector De Castro, N. Y.:* I have just received your letter. That agreement will not suit me. I will sign a proper one when I come east, and the thing is cleaned up.

"For Stokes."

The letter reads as follows:

"SAN FRANCISCO, Jan. 3, 1889.

"*Col. R. G. Ingersoll*—MY DEAR COL.: Your letter and article of agreement, dated the 26th, received. On looking over the agreement, I see no necessity for signing it. Some portions of it are wrong. You say it releases C. H. Reed & Co. from all claims. The claim I hold against C. H. Reed & Co. has nothing whatever to do with the telegraph business. There is no necessity to make any change at present, except to place the securities with Mr. Platt for safe-keeping, &c. You know exactly what is to be done, and I want nothing done except through your instructions.

"Very sincerely,          JOHN W. MACKAY."

Not a word here suggestive of real repudiation. No direction to return the bonds to Stokes because the consideration, now fully disclosed, was such as did not meet his approval. On the contrary, a full recognition by him of his receipt and control of the bonds. With full knowledge of the facts, and presumbly of the legal consequences of his affirmation, he writes: "There is no necessity to make any change at present except to place the securities with Mr. Platt for safe-keeping, &c." In other words, he says: "Although I do not sign the agreement as it reads,—as in its present form it does not suit me,—still, place the securities with Platt (that is, with me) for safe-keeping, &c." In the telegram to De Castro, of January 4, 1889, "for Stokes," he does not object to the purchase price, or to any particular clause in the agreement. He simply says it does not suit him, and that he will sign a proper agreement when he comes east, and the whole thing is cleaned up. Any one reading such a telegram might well imagine that the substantial terms of the agreement were not seriously objected to, but that with some modifications, of no great importance, the agreement (which he retained in his possession, with Stokes' signature) would yet be signed. In the letter he objects to nothing in particular except the release of Reed & Co., and as to that his objection is not put upon the ground that the amount of that claim plus $100,000 was too much to pay for Stokes' interests, but upon the ground that the claim was irrelevant to the telegraph business.

He says that "on looking over the agreement" he sees "no necessity for signing it." He sees no necessity, in fact, for anything else, "at present, except to place the securities" in what amounted to his own possession," for safe-keeping, &c." Still later,—in March, 1889,—when Mackay arrived in this city, and found that Ingersoll had the securities, he went to Ingersoll, told him he would make no settlement with Stokes until he had an account, and at the same time he asked Ingersoll to give him the securities. All this was before what is called the "New Agreement," and it amounted to an additional affirmation of the already approved contract, (which was still in his pocket, signed by Stokes, but unsigned by him,) quite as much as though he had then brought replevin for the securities directly against Ingersoll, or as though Ingersoll had complied with his demand and delivered the securities to him thereon. It in fact never occurred to Mackay at any time to restore Stokes to his original position, or to suggest that he should be so restored. On the contrary, he persistently acted upon the theory that Stokes had no position to be restored to, and no rights whatever. He continued to insist upon enjoying the position which the contract alone gave him, and to demand that all concerned should do what would effectually prevent Stokes from reoccupying the position which was his when the contract was prepared. He thus sought to brush aside the rule of law which forbids affirmance in part under penalty of affirmance of the whole, just as he brushed aside Platt's provisional suggestion, and said: "Get the bonds now. They are mine." Yet he protests that he is not liable upon the contract. And why? Because, as he repeats over and over again, the securities were his, and Stokes had no right even to assert a claim thereto. We speak with moderation when we say no more than that this position is untenable.

Our conclusion is that Mackay, on his own showing, not only approved of the contract by his telegram of December 24, 1888, but that his subsequent acts with regard to the securities were acts of repeated affirmation with full knowledge of the facts; and that as late as March, 1889, when he demanded the bonds of Ingersoll, he again elected to adopt the contract, and to treat the securities in Ingersoll's hands as his property thereunder. Having reached this conclusion, it follows that the request to go to the jury as to a subsequent abandonment of the contract was properly refused. At the time when this abandonment is claimed—we refer to the one-sided arrangement, denied by Stokes, whereby Ingersoll was to deliver the securities to Mackay, Stokes to receive no compensation whatever, but to rely wholly upon Mackay's generosity—the original agreement was no longer executory. It had, indeed, been largely executed. Many securities had, in the first instance, been turned over, and their physical possession surrendered to Ingersoll. Subsequently these securities were ceded to Mackay, as evidenced by De Castro's receipt, and the understanding which accompanied it. Ingersoll's position was thus changed from that of stakeholder to that of Mackay's bailee; and this latter was thereafter his true position, whether or not he was made aware of the facts from which such bailment resulted. Still other securities were afterwards turned over. Stokes, too, had "gone out" of the enterprise, and had relinquished his right to any profits which might ever accrue therefrom. All, therefore, that can be claimed for the new arrangement is that Stokes, after partial performance of the originally approved and repeatedly affirmed agreement, and without renunciation by Mackay of complete performance, waived all his rights while fulfilling all his obligations thereunder; did, in fact, all he had agreed to do, and told Mackay he need do none of the things which he had agreed to do. That was no new agreement at all. Whatever it was, it was wholly without consideration. Stokes' rights under the original agreement were vested rights, and for these vested rights he had given a good consideration, not merely in his promise, but in the partial performance of what

he had so promised, namely, in the giving of property and in the relinquishment of rights.

We have thus fully considered all the questions which were raised by the pleadings and proofs. .Questions with regard to Stokes' alleged failure to account for moneys used in the telegraph business, or to furnish statements concerning the business of the Hoffman House, are foreign to the present inquiry, as there is no allegation in Mackay's answer of misapplication of funds, or of any concealment on that head when the contract in question was made. The same observation applies to the suggestion that if a principal can be held to such a contract as this, upon his approval thereof after reading a telegram, which failed to disclose the consideration on his part, he might in the same way obligate himself unknowingly for perhaps his entire fortune. It is not contended, nor do we mean to convey the idea, that the doctrine which binds Mackay to the present contract would have bound him to any agreement, however extreme or unreasonable, made on his behalf. The agreement which would thus bind a principal must of course be a reasonable agreement, one made in good faith, and without collusion or fraud. And the consideration which the principal approves of without inquiry must equally be reasonable, and such as a man under all the circumstances might be deemed willing to accept without inquiry. There is no allegation in Mackay's answer that this contract was not fair and reasonable, nor do we find in the entire record any suggestion of bad faith with regard to its terms. Indeed, as already pointed out, Mackay has never directly indicated that he deemed the consideration excessive or unreasonable.

As to the bonds in the hands of the Chemical Bank, the learned trial judge committed no error. These bonds belong to Mackay, and Stokes is bound to deliver them to him under his contract. Mackay is none the less responsible for the consideration money because they have not yet been delivered.

There are other questions, which we do not deem of sufficient importance to consider specially, such as the respondent's claim of ratification by the payment (on February 25, 1889) of the note for $25,000 due at the Western Bank, and the appellants' claim with regard to the schedules and the admissibility of evidence. We think no error was committed in the disposition of any of these questions, or of any other question presented by the record. The verdict was properly directed, and the judgment and order appealed from should therefore be affirmed, with costs.

VAN BRUNT, P. J   I concur in the foregoing opinion, and think that there is an additional ground for sustaining the judgment. The plaintiff having surrendered these securities upon the faith of a supposed contract whereby the defendant Mackay was bound, Mackay cannot be allowed to repudiate the contract without returning what he or his agents have received thereunder. Neither can he ratify a part of the contract without ratifying the whole, as the principle is well settled that a ratification of part of an unauthorized transaction of an agent, or one who assumes to act as such, is a ratification of the whole. *Corning* v. *Southland,* 3 Hill, 552; *Moss* v. *Mining Co.,* 5 Hill, 137; *Farmers' L. & T. Co.* v. *Walworth,* 1 N. Y. 433; *Crans* v. *Hunter,* 28 N. Y. 389; *Elwell* v. *Chamberlain,* 31 N. Y. 611; *Fowler* v. *Bank,* 67 N. Y. 138; *Culver* v. *Ashley,* 19 Pick. 300, and cases there cited.

O'BRIEN, J., concurs.